IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BRADFORD M. KENDRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:19-cv-00047 |
| | ) | |
| CARTER BANK & TRUST, INC. | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This case arises out of a former employment relationship between Bradford M. Kendrick and Carter Bank & Trust, Inc. (the Bank).  Kendrick asserts claims of harassment and retaliation in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*  Presently before the court is the Bank's motion for summary judgment, as well as the Bank's motion to exclude the testimony of Kendrick's expert and two motions to strike Kendrick's supplementation of the record.  For the reasons set forth below, the court will grant the Bank's motion for summary judgment, dismiss as moot the Bank's motion to exclude and motion to strike the expert's supplemental declaration, and grant the Bank's motion to strike Kendrick's notice of supplemental facts.

I.  BACKGROUND

Kendrick was hired at the predecessor entity of Carter Bank in 1985 by Worth Harris Carter, Jr., the Bank's founder and its former President and Chairman of the Board.  (Kendrick Dep. 20:5–7, Ex. A to Mot. for Summ. J.[1])  Kendrick was promoted several times over the course

---

[1]  Unless otherwise noted, the court's references to deposition exhibits are to those depositions attached to the Bank's memorandum in support of its motion for summary judgment, redacted versions of which are docketed at Dkt. No. 180.

of his employment and eventually obtained the position of Executive Vice-President IT (VP-IT) in 2014.  (*Id*. at 21:3–9.)  During Kendrick's tenure as the leader of the IT department, the Bank suffered from significant technological deficits.  (Speare Dep. 46:24–47:17, Ex. I to Mot. for Summ. J.; Kendrick Dep. 305:16–306:2.)  The Bank performed most transactions manually and did not have ATMs or online banking.  (Kendrick Dep. 38:15–39:10; 150:1–151:2; 307:20.)  Kendrick oversaw the Bank's use of a core operating system called "CoreSoft" to maintain its critical customer information.  (*Id.* at 99:3–17.)  Coresoft had significant operational issues, and the Bank's regulators had serious concerns with the software.  (*Id.* at 39:18–20; 98:20–22.)  Kendrick admits that, during his leadership of the IT department, the Bank was twenty or more years behind its peers in its technology.  (*Id.* at 305:16–306:2.)

After Carter passed away in April 2017, Litz van Dyke became CEO of the Bank.  (van Dyke Dep. 56:9–10, Ex. J to Mot. for Summ. J.)  Under this new leadership, the Bank sought to modernize its technology and move away from Coresoft.  (Karavatakis Dep. 146:1–9, Ex. F to Mot. for Summ. J)  To facilitate this modernization, the Bank established the position of Chief Information Officer (CIO).  (Kendrick Dep. 149:16–21.)  Although Kendrick expressed interest in the CIO position and believed he had already been performing the duties of a CIO as the leader of the IT department, the Bank ultimately hired Matt Speare as the CIO on July 1, 2017, at which point Kendrick became Executive Vice President, Chief Information Security Officer ("CISO").  (*Id.* at 240:5–18; Speare Dep. 16:6–8, 54:13–56:6.)  At the time of his hiring, Speare was 50 years old, while Kendrick was in his early sixties.  (August 2019 EEOC Charge 1–2, Ex. 80 to Mot. for Summ. J.)  The parties agree that Speare had significantly more technological experience than Kendrick, who was only familiar with the admittedly problematic Coresoft system.  (Kendrick Dep. 308:11–21.)  Kendrick himself interviewed Speare and found that he

had experience with a variety of emerging technologies that were in high demand among consumers.  (*Id.* at 157:7–11; 302:3–13.)

Following Speare's arrival, the Bank reassigned most of Kendrick's duties to Speare and Kendrick no longer attended executive meetings.  (*Id.* at 252:11–19, 293:15.)  Kendrick further reports that he experienced several instances of age-based harassment by Speare, van Dyke, Phyllis Karavatakis, the Bank's former President and current Senior Executive Vice President for Special Projects, and David Peterson, the Bank's Chief Credit Officer.  (August 2019 EEOC Charge 6–7.)

On August 14, 2019, Kendrick filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that he was "being harassed and discriminated against on account of [his] age."  (*Id.* at 3.)  On September 11, 2019, the EEOC issued a Dismissal and Notice of Rights, which indicated that the EEOC was closing its file on the charge of discrimination because it was not timely filed.  (Ex. 82 to Mot. for Summ. J.)  Kendrick then filed the present suit on December 2, 2019.  (*See* Dkt. No. 1.)

After he filed this lawsuit, Kendrick maintained his employment with the Bank without incident.  However, in May 2020, Kendrick, without his employer's authorization, removed a stack of the Bank's documents and gave them to his attorney.  (Kendrick Dep. 331:12–16.)  On May 8, 2020, Kendrick, through his attorney, uploaded onto the Public Access to Court Electronic Records (PACER) system several of the Bank's documents containing confidential information regarding the Bank's customers, as well as confidential Board meeting minutes and correspondence from the Federal Deposit Insurance Corporation (FDIC) and the Virginia Bureau of Financial Institutions.  (*Id.* at 338:12–339:4; Email from FDIC to the Bank 1, Ex. 84 to Mot. for Summ. J.)  On May 29, 2020, the Bank terminated Kendrick's employment and told him the

reason for his termination was because he allowed the Bank's confidential information to be shared publicly in violation of the Bank's code of conduct and Kendrick's pledge of confidentiality.  (Termination Letter 1, Ex. 273 to Mot. for Summ. J.)

On June 2, 2020, Kendrick filed his second charge with the EEOC for both age discrimination and retaliation and received a notice of right to sue on September 24, 2020.  (Mot. to Am. 1, Dkt. No. 82.)  Kendrick then filed his Second Amended Complaint on December 8, 2020, which added a charge of retaliation against the Bank.  (*See* Dkt. No. 84.)  The Bank filed a motion for summary judgment (Dkt. No. 165) on November 9, 2022, along with a motion to exclude the testimony of Kendrick's expert witness, David Hart (Dkt. No. 167).  The Bank subsequently filed a motion to strike a supplemental declaration by Hart (Dkt. No. 183).  These motions were fully briefed, and a hearing was held on August 10, 2023.  Several days after the hearing, Kendrick filed a notice of supplemental facts regarding several of the Bank's previous lawsuits (Dkt. No. 220).[2]  The Bank filed a motion to strike this notice (Dkt. No. 221); this motion has been fully briefed.  All motions are ripe for resolution.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead to a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S.

---

[2] Kendrick has also filed four subsequent notices of additional evidence with similar content as the notice subject to the Bank's motion to strike.  (*See* Dkt. Nos. 228, 229, 230, 231.)

557, 586 (2009).[3]  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

## B.  Count I: Disparate Treatment

The ADEA forbids an employer "to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Kendrick identifies four adverse employment actions that purportedly constitute disparate treatment under the ADEA: being "stripped" of his Executive Officer title and duties, two times he was not given annual performance reviews (in 2019 and 2020), and his termination on May 29, 2020.  (Br. in Supp. of Mot. for Summ. J. 21–22, Dkt. No. 166.)  However, any claims involving the purported stripping of Kendrick's title and duties are time-barred.  The late Senior Judge Conrad previously ruled that any disparate treatment claims involving conduct that occurred prior to October 19, 2018, are time-barred.  (Order on Mot. to Dismiss 1, Dkt. No. 45.)  Kendrick alleges that he was stripped of his title and job duties when Speare became the CIO in July 2017.  The court will

---

[3]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.

therefore only consider Kendrick's disparate treatment claims based on the lack of performance reviews in 2019 and 2020 and his termination.

### 1. Direct evidence of disparate treatment

A plaintiff can prove a violation of the ADEA through direct or circumstantial evidence. *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019). Kendrick claims that several derogatory comments made by his coworkers are *direct evidence* of his disparate treatment at the Bank. The Fourth Circuit has found that "derogatory comments are direct evidence of discrimination if they are (1) 'related to the protected class of persons of which the plaintiff is a member'; (2) 'proximate in time to the complained-of adverse employment decision'; (3) 'made by an individual with authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'" *Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (emphasis added) (applying the standard in *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374 (5th Cir. 2010)); *see also Arthur v. Pet Dairy*, 593 F. App'x 211, 219 (4th Cir. 2015) (noting that the "[*Jackson*] test is consistent with our precedent, and we are content to adopt it here").

Kendrick lists four comments that purportedly constitute direct evidence of age discrimination: (1) a statement made by Karavatakis, sometime before April 2017, that Kendrick and other older employees should be "finding [their] replacements"; (2) Speare's late 2017 statement that the Bank's employees "are not getting any younger" and "we need to be hiring younger people because it takes longer for older people to learn the new technologies"; (3) statements in 2017 regarding succession planning for the Board of Directors; and (4) a statement made by Van Dyke during his 2022 deposition that, in the context of a succession planning discussion in June 2020, the Bank needed to "achieve the right balance of tenure, age, market

6

representation, diversity, and expertise" on the Board of Directors.  (Br. in Supp. 18; Resp. in Opp'n to Mot. for Summ. J. 10–11, Dkt. No. 177.)

As to the first comment, while it may be related to Kendrick's age, there is no evidence that Karavatakis took part in the decision to terminate Kendrick or ever determined whether Kendrick was given performance reviews.  Further, the statement is not even remotely proximate in time to the lack of performance reviews and termination, and it certainly is not related to the reviews or Kendrick's termination.  The second comment is similarly remote in time from the reviews and Kendrick's termination and does not directly concern the adverse employment actions at issue here.  The third comment is also unrelated in time and substance to the performance reviews and the termination.  Indeed, Kendrick was not even a member of the Board of Directors, and Speare's comments addressed succession planning specifically for the Board.  (Kendrick Dep. 114:1–4.)  Finally, the fourth statement was made in 2022 and concerned a conversation about succession planning for the Board of Directors in June 2020 (a month after Kendrick's termination).  Although referencing something that was said in 2020, this statement itself was made two years *after* Kendrick's termination and, again, is specific to the Board of Directors.  (van Dyke Dep. 130:21–135:24.)  Kendrick has therefore failed to provide direct evidence of disparate treatment under the ADEA.

### 2. Circumstantial evidence of disparate treatment

#### a. *Legal standards*

Kendrick also fails to present sufficient circumstantial evidence of any disparate treatment by the Bank to survive summary judgment.  A plaintiff can prove an ADEA violation through circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see also Westmoreland,* 924 F.3d at 725

(applying *McDonnell Douglas* to ADEA claim).  The *McDonnell Douglas* framework consists of three steps: "(1) the plaintiff must establish a *prima facie* case of discrimination; (2) if the plaintiff presents a *prima facie* case, then the burden shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action; and (3) if the defendant shows such a reason, then the burden shifts to the plaintiff to prove that the reason is pretextual." *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 229 (4th Cir. 2018) (per curiam) (citing *McDonnell Douglas*, 411 U.S. at 802–04; *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).  At the final stage, "[t]he employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant-employer were not its true reasons, but were a pretext for discrimination.'" *Westmoreland*, 924 F.3d at 726 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (internal citations omitted).

In order to show a *prima facie* case of disparate treatment under the ADEA, a plaintiff must establish four elements: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing satisfactorily at the time of his adverse employment action, and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 484–87 (4th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

### b. Performance reviews

The court will first address whether Kendrick has shown a *prima facie* case of disparate treatment as to the performance reviews.  Kendrick is indisputably a member of a protected class since he was aged forty or older during the events at issue here.  29 U.S.C.S. § 631(a).  Next is the question of whether the lack of performance reviews in 2019 and 2020 were adverse

employment actions.  An adverse employment action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122–23 (4th Cir. 2021) (internal citations omitted).  Kendrick states in his complaint that "the [p]reparation of annual performance evaluations is an important term and condition of employment, for performance evaluations affect all aspects of employment, including compensation and promotions."  (Second Am. Compl. ¶ 26.)  Kendrick, however, fails to specify how the lack of performance evaluations affected the terms and conditions of *his own* employment.  Kendrick further prevaricates on this issue in his response to the Bank's motion for summary judgment, contending, "This case is about far more than performance reviews.  Even if the lack of a performance review was not considered an adverse employment action, the fact that the Bank stripped Kendrick of his duties . . . [and] assigned sham titles to him with no job descriptions or duties . . . unquestionably constitutes adverse employment actions."  (Resp. in Opp'n 17.)  Though, as the court noted above, any claims involving the "stripping" of Kendrick's title and duties are time-barred.

While the summary judgment standard instructs the court to view the facts in the light most favorable to the non-moving party, the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Rather, a non-moving party must produce some evidence (more than a "scintilla") "upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251 (internal citations omitted).  Kendrick has provided *no* evidence, not even a mere scintilla, of the adverse effect the lack of performance reviews had on the terms and conditions of his employment.  He only provides a generalized statement regarding the impact of performance

reviews on a broad scale.  Kendrick has failed to make out a *prima facie* case for disparate treatment as to the lack of performance reviews under the ADEA; therefore, the court need not complete the *McDonnell-Douglas* analysis.  *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019) ("Perkins has not offered evidence indicating [his employer's] failure to give him annual reviews adversely affected the terms, benefits and conditions of his employment.  Thus, Perkins' claim about annual reviews fails the third requirement of a disparate treatment claim."). The court finds that Kendrick has failed to provide sufficient evidence of disparate treatment as to the performance reviews.

> c. *Kendrick's termination*

In contrast, Kendrick's termination was undisputedly an adverse employment action.  *See Roberts*, 998 F.3d at 123 ("Discharge from employment is one form of adverse employment action.") (internal quotations omitted).  Further, Kendrick asserts that he was performing satisfactorily at the time of his termination.  (Resp. in Opp'n 18.)  Kendrick's expert Hart contends that Kendrick was a "very valuable asset" to the Bank.  (Hart Expert Report 1, Dkt. No. 168-2.)  However, the question of whether an employee met his employer's legitimate job expectations at the time of termination depends on the "perception of the decision maker . . . , not the self-assessment of the plaintiff . . . ."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).  "And because it is the plaintiff's burden to persuade the trier of fact that he met his employer's legitimate subjective employment expectations, at the *prima facie* stage we must consider the employer's 'evidence that the employee was not meeting those expectations'. . . . Otherwise, it would be 'difficult to imagine a case where an employee could not satisfy the . . . legitimate expectation element.'"  *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*,

629 F. App'x 466, 469 (4th Cir. 2015) (citing *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006)) (internal citations omitted).

Multiple Bank employees attest to Kendrick's lack of qualifications and unsatisfactory work performance.  Karavatakis stated that Kendrick "didn't know the new technology" and that the Bank's lack of technological advancement was attributable to Kendrick in his role as leader of the IT department.  (Karavatakis Dep. 36:24-37:18.)  Van Dyke stated that Kendrick did not have "the qualifications for the CIO position" and recommended not increasing his salary because of problems with the IT department.  (Excerpt of Board Minutes 1, Ex. 148 to Mot. for Summ. J.)  Speare recommended Kendrick for severance in January 2019 because of his "[l]ack of leadership skills[,]" "[l]ack of understanding of the underlying technologies[,]" inability "to develop a strategy or execute upon one[,]" and practice of "wait[ing] to be told what to do[.]"  (Speare Email 2, Ex. 272.)  Finally, and most importantly, Kendrick was not performing satisfactorily when he violated the Bank's Code of Conduct and confidentiality policy.  Courts have found that the violation of an employer's policy necessarily leads to a finding that an employee's work performance was unsatisfactory.  *See, e.g.*, *Mathews v. Giant Food, Inc.*, 187 F. Supp. 2d 486, 489 (D. Md. 2002) ("Mathews' violation of Giant's policy indicates that his performance was not satisfactory."); *Blair v. Colonnas Shipyard Inc.*, 52 F. Supp. 2d 687, 694 (E.D. Va. 1999), *aff'd*, 203 F.3d 819 (4th Cir. 2000) ("Accordingly, since [employee] violated policies that the [employer] considered 'very important,' he did not perform his job satisfactorily and cannot establish a prima facie case of race discrimination."); *Farasat v. Paulikas*, 32 F. Supp. 2d 249, 255 (D. Md. 1998), *aff'd*, 166 F.3d 1208 (4th Cir. 1998) (holding that employee's performance was unsatisfactory in part because he was tardy on a regular basis in violation of workplace policy).  Indeed, Kendrick *concedes* that the dissemination of confidential documents

in violation of the Bank's policies is a terminable offense.  (Kendrick Dep. 78:14–19.)  For these reasons, the court cannot find that Kendrick was performing satisfactorily in his position prior to his termination.  Kendrick has therefore failed to make out a *prima facie* case of disparate treatment under the ADEA.

Even if Kendrick *could* show that he was performing satisfactorily at the time of his termination, he still fails to demonstrate that his termination occurred "under circumstances which give rise to an inference of unlawful discrimination" and therefore cannot make out a case of disparate treatment.  Kendrick contends he was terminated because the Bank had an "opportunity to get rid of an old man with Carter Bank due to age."[4]  (Kendrick Dep. 359:22–360:1.)  Apart from this conclusory statement, however, Kendrick does not offer any other evidence that he was terminated *because of* his age.  Kendrick instead asserts that summary judgment is inappropriate because there are genuine disputes of material fact regarding who decided to fire him, when that decision was made, and whether the reasons given for his termination were legitimate.  (Resp. in Opp'n 14–17, 24–26.)

> i.  *Purported issues of material fact*

"A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law.  An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."  *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (internal citations omitted).

There is some disagreement among the Bank's employees as to who made the ultimate decision to terminate Kendrick.  Some of the employees stated that it was the Board of Directors who decided to terminate Kendrick, while others stated that Speare, van Dyke, and Carney made

---

[4]  Kendrick also claims that he was terminated in retaliation for filing his EEOC complaint and this lawsuit. The court will address Kendrick's retaliation claim *infra*.

the decision.  (Resp. in Opp'n 14–15.)  Whether it was the Board or the three employees that made the decision is immaterial; this inconsistency does not give rise to an inference of unlawful discrimination.  Kendrick does not provide any evidence asserting that the Board and the group of three employees had differing motivations for his termination, or that one group discriminated against him because of his age and the other did not.  Kendrick simply contends that "a question of fact exists with respect to who made the decision to discharge Kendrick."  (*Id.* at 15.)  The court finds that this dispute of fact would not affect the disposition of this case and is therefore immaterial.

The question of *when* Kendrick was terminated is also immaterial and does not give rise to an inference of unlawful discrimination.  Kendrick claims that Speare's naming him as a candidate for severance in January 2019, "supports a finding that the decision to discharge Kendrick was made well before May 29, 2020, when his employment was actually terminated . . . and raises a question of fact as to when that decision was made."  (*Id.*)  Yet Kendrick fails to meaningfully explain how such a question of fact would bear on whether his termination was based on his age.  Kendrick argues that one of the reasons Speare provided for his proposed severance, that Kendrick lacked "an understanding of the underlying technologies[,]" is consistent with "common ageist stereotypes—namely, that older workers are 'resistant to change' and are unable or unwilling to learn or adapt to new technology."  *Peterson v. Mid-State Grp., Inc.*, 54 F. Supp. 3d 1039, 1044 (E.D. Wis. 2014).  First, it is difficult to see how this statement is based on "ageist stereotypes" when Kendrick *readily admits* that he did not have experience with other banking systems.  (*See* Kendrick Dep. 308:2–14 (agreeing that he "didn't have experience with other systems used by other banks . . . .").)  Moreover, while Kendrick cites several cases where courts found that employers engaged in age discrimination when they relied upon these

stereotypes to take adverse action against their employees (Resp. in Opp'n 11–12), these cases are not analogous to the case at hand.  First, none of the plaintiffs were the *leaders* of a company's IT department who were directly responsible for the implementation of new technology.  Indeed, in *Hartsel v. Keys*, the Sixth Circuit found that the denial of an employee's promotion due to her inferior computer skills relative to other candidates *did not* establish a *prima facie* case of age discrimination because computer expertise was a "hiring criterion" for the position.  87 F.3d 795, 801 (6th Cir. 1996).  Similarly, Kendrick's role in the IT department required him to have up-to-date technological expertise.

Additionally, the plaintiffs in the cited cases were fired or had an adverse employment action taken against them *explicitly because of* their inability to adapt to new technology.  *See Peterson*, 54 F. Supp. 3d at 1042 ("[Peterson's manager] told Peterson that the reason for his termination was his failure to learn how to operate the computer system."); *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 731 (8th Cir. 1996) ("[The employer] sought to transfer Parrish because of her inefficiency and her difficulties with her computer system.").  Kendrick does not provide evidence to demonstrate that he was fired explicitly for his inability to adapt to new technology, just that Speare *may* have relied on ageist stereotypes when offering Kendrick up as a possible candidate for severance and that these same reasons *may* have influenced the decision to terminate Kendrick a year and a half later.  As discussed above, a non-movant in summary judgment "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another," yet, here, Kendrick asks the court to do just that.  *Beale*, 769 F.2d at 214.  Kendrick fails to establish that any dispute about when the decision was made to terminate him should preclude summary judgment.

14

Finally, Kendrick claims there is a genuine question of material fact regarding the reasons given for his termination.  Kendrick questions whether the documents were actually confidential under the Bank's code of conduct, given that customer information is not explicitly protected under the policy.  (Resp. in Opp'n 24.)  Kendrick points out that the Bank has previously published customers' names and their loan amounts when they filed lawsuits against these customers and contends that the customer information he made public must not have been actually confidential under the code of conduct.  (Hr'g Tr. 45:15–46:2, Dkt. No. 226.)  Kendrick first raised this argument during the hearing on August 10, 2023.  (*Id.*)  On August 21, 2023, Kendrick filed a notice of supplemental facts that included numerous loan default cases and confessions of judgment that the Bank filed in state court.  (Dkt. No. 220.)  Kendrick subsequently filed additional notices with similar content.  (*See* Dkt. Nos. 228, 229, 230, 231.) Kendrick did not seek leave from the court to file these notices as required by Local Rule 11(c)(1), so these notices are ultimately untimely.  The court, therefore, does not consider these supplemental documents to be part of the summary judgment record.

Moreover, even if the court considered the supplemental documents, a decision by the Bank to make a limited disclosure of customers' names and loan amounts to collect on these loans is not comparable to Kendrick's individual, unauthorized decision to disclose confidential supervisory information and letters and reports from the FDIC and the Virginia Bureau of Financial Institutions, in addition to confidential customer information.  Given the circumstances of and the significant breadth of Kendrick's disclosures, the fact that the Bank included basic customer information in certain lawsuits would not give rise to a genuine issue of material fact as to whether Kendrick's termination was motivated by age.

Kendrick maintains that the reasons given for his termination were pretextual and that the "real" reason for his termination was his age, not the public dissemination of confidential information.  (Resp. in Opp'n 24.)  However, Kendrick has not provided evidence to support such an inference, only that *some* of the information he disseminated may not be confidential under the code of conduct.  Kendrick overlooks the fact that the documents he took not only contained customer information but also confidential Board meeting minutes and correspondence with the FDIC and the Virginia BFI; Kendrick does not contest the confidentiality of this other information.  Furthermore, the Bank "had a reasonable and significant interest in preventing the dissemination of confidential . . . documents[,]" and Kendrick acted against this interest when he unilaterally decided to disclose the Bank's confidential information.  *See Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (finding that employer's interest in security and confidentiality of personnel documents outweighed employee's interest in removing documents to support of her Title VII discrimination claim).  Therefore, the question of whether the *customer information* was confidential under the Bank's code of conduct would not affect the disposition of the case, because Kendrick also disseminated undisputedly confidential documents in contravention of the Bank's interests.  Nor would this issue of fact cause a reasonable jury to find that age, not the dissemination of confidential documents, was the reason for his termination.

To summarize, Kendrick has not presented evidence from which a reasonable jury could conclude that his termination "occurred under circumstances that would give rise to an inference of unlawful discrimination."  *Miles*, 429 F.3d at 487 n.3.  Kendrick has therefore failed to establish a *prima facie* case for disparate treatment under the ADEA as to his termination.

*d. The Bank's legitimate, non-discriminatory reason for Kendrick's termination*

Even if Kendrick *had* established a *prima facie* case of disparate treatment as to his

termination, the Bank has provided a legitimate, non-discriminatory reason for Kendrick's

termination that defeats Kendrick's claim.  The Bank asserts,

> Kendrick was terminated from Carter Bank on May 29, 2020[,] because he
> wrongfully and indisputably took confidential bank and customer information
> from Carter Bank, without authorization, in violation of Carter Bank's policies
> and his Pledge of Confidentiality to Carter Bank, and "[o]n May 8, 2020, [he]
> allowed confidential Carter Bank & Trust information to be posted on the PACER
> system, which made the confidential information available to the public.

(Br. in Supp. 2.)  Courts have found that a violation of workplace policies is a legitimate, non-

discriminatory reason for termination.  *See Hicks v. Carilion Med. Ctr.*, No. 7:17-cv-00247, 2019

WL 1394390, at *8 (W.D. Va. Mar. 27, 2019) (holding that violation of workplace violence

policy constitutes legitimate, non-discriminatory reason for termination); *Gonzalez v.

Faithful+Gould, Inc.,* No. 1:17-cv-624, 2017 WL 6559905, at *4 (E.D. Va. Dec. 22, 2017), *aff'd*,

741 F. App'x 961 (4th Cir. 2018) (finding that violation of workplace code of conduct is

legitimate, non-discriminatory reason for termination); *cf. Vannoy v. Fed. Reserve Bank of

Richmond*, 827 F.3d 296, 304–05 (4th Cir. 2016) ("The FMLA does not prevent an employer

from terminating an employee for poor performance, misconduct, or insubordinate behavior.").

Furthermore, Kendrick has failed to "produce[] evidence from which a jury could conclude that

the defendant did not honestly believe that [Kendrick] had violated company policy . . . ."

*Goodman v. Family Dollar Stores, Inc.*, No. 8:06-2605-RBH-BHH, 2008 WL 4200160, at *6

(D.S.C. May 7, 2008.) *report and recommendation adopted as to motive for termination*, No.

8:06-02605-RBH, 2008 WL 4200158 (D.S.C. Sept. 2, 2008); *see also Powell v. Biscuitville Inc.*,

No. 6:19-cv-80, 2020 WL 7054241, at *4 (W.D. Va. Dec. 2, 2020), *aff'd*, 858 F. App'x 631 (4th

Cir. 2021) ("Case law suggests that an honest belief that an employee has violated workplace

policies or rules is sufficient to establish a non-pretextual basis for terminating employment.").
The Bank has therefore provided a legitimate, non-discriminatory reason for Kendrick's
termination.

As stated above, Kendrick does not provide sufficient evidence to demonstrate that his
termination was pretextual.  "A plaintiff must prove by a preponderance of the evidence that the
legitimate reasons offered by the defendant were not its true reasons, but were a pretext for
discrimination." *Westmoreland*, 924 F.3d at 726 (internal quotations omitted).  Furthermore, in
order to prevail on a disparate treatment claim under the ADEA, "a plaintiff cannot show that
age was one of *multiple* motives for an employer's decision; the employee must prove that the
employer would not have [taken the adverse action] in the absence of age discrimination."
*Bandy v. City of Salem*, 59 F.4th 705, 710 (4th Cir. 2023) (emphasis in original, internal citations
omitted).  Kendrick has not produced evidence to show a genuine dispute of material fact as to
whether, but for his age, he would not have been terminated.  The court therefore finds that, as a
matter of law, Kendrick's termination did not constitute disparate treatment under the ADEA.

For all of these reasons, the court will grant the Bank's motion for summary judgment as
to Kendrick's disparate treatment claim in Count I.

## C.  Count I: Hostile Work Environment

Kendrick also claims that he was subjected to a hostile work environment at the Bank.
Although "[t]he ADEA does not expressly prohibit the creation of a hostile work environment,"
the Fourth Circuit "has permitted such claims, relying [] on Title VII hostile work environment
standards for ADEA claims." *Jones v. Wormuth*, No. ADC-21-860, 2021 WL 4290486, at *6 (D.
Md. Sept. 21, 2021) (citing *Kearns v. Northrop Grumman Sys. Corp.*, No. ELH-11-1736, 2014
WL 2170781, at *16 (D. Md. May 23, 2014)) (internal citations omitted).  To state a hostile work

18

environment claim under Title VII, and therefore the ADEA, a plaintiff must allege sufficient facts to show that: (1) he experienced unwelcome harassment; (2) the harassment was based on his age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on his employer.  *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006).

Kendrick contends that the question of whether harassment is sufficiently "severe or pervasive" to meet the hostile work environment standard is "quintessentially a question of fact" for the jury.  *Hartsell v. Duplex Prods.*, 123 F.3d 766, 773 (4th Cir. 1997) (internal quotations omitted).  However, this is not an "invariable rule . . . . When no reasonable jury—even if it credited all the plaintiff's evidence and drew all reasonable inferences in her favor—could find harassment rising to the level of 'severe or pervasive,' summary judgment is appropriately awarded to the defendant."  *Sowash v. Marshalls of MA, Inc.*, No. 21-1656, 2022 WL 2256312, at *5 (4th Cir. June 23, 2022).

Such is the case here.  Kendrick alleges several instances of harassment that purportedly led to a hostile work environment.  As discussed above, Karavatakis told Kendrick that he needed to find his replacement and Speare stated that the Bank's employees were not "getting any younger" and the Bank needed to be "hiring younger people[;]" both of these statements were purportedly made in 2017.[5]  (Kendrick Dep. 316:13–17, 374:8–11.)  While these comments

---

[5] Unlike disparate treatment claims, the continuing violation doctrine applies to hostile work environment claims.  *See Perkins*, 936 F.3d at 209 n.5 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).  Under this doctrine, "a hostile work environment claim may appropriately extend . . . to acts that occurred before the limitations period [if] the hostile work environment continued within the limitations period as well."  *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007) (internal quotation marks and citation omitted).  Thus, "'[i]n determining whether an actionable hostile work environment claim exists, [courts] look to all the circumstances,' and '[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability.'"  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222 (4th Cir. 2016).  The court will therefore examine all alleged instances of harassment, not just those on or after October 19, 2018.

were unwelcome to Kendrick and did implicate his age, or at least age generally, Kendrick

cannot establish that this harassment was "sufficiently severe or pervasive to alter the conditions

of [his] employment and to create an abusive atmosphere." *Boyer-Liberto v. Fontainebleau*

*Corp.*, 786 F.3d 264, 271 (4th Cir. 2015). To establish the existence of a hostile environment, the

workplace must be "permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal

citations and quotations omitted). Furthermore, "[t]o recover on a hostile environment claim, a

plaintiff must demonstrate not only that he subjectively perceived his workplace environment as

hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively

hostile." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001). Additionally, the Fourth

Circuit has stated, "[W]hen determining whether the harassing conduct was objectively severe or

pervasive, we must look at all the circumstances, including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotations omitted).

The court concludes that no reasonable jury would find that these incidents of harassment

were pervasive enough to alter the conditions of Kendrick's employment. Beyond these

comments, Kendrick does not provide any other examples of age-based harassment, nor does he

contend that he was subjected to frequent and repeated harassment. *See Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims . . . [by their] very

nature involve[] repeated conduct."). Furthermore, these instances of harassment appear to have

been merely offhand comments that did not interfere with the terms and conditions of Kendrick's

employment.  *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").  As such, a reasonable jury would not find that these isolated comments led to a hostile work environment.

Kendrick does cite several other instances of "harassment" that he believes contributed to a hostile work environment, yet these comments do not implicate Kendrick's age in any way. Kendrick claims that Karavatakis and Peterson, who are the same age or older than Kendrick, would "make fun of my voice" and "mak[e] fun of me in front of people."  (Kendrick Dep. 264:1–11.)  Kendrick *concedes*, however, that they were not "making fun" of him because of his age but instead were trying to be "funny or cute."  (*Id.* at 265:2–3.)  Kendrick also lists several other episodes of "bullying" from Karavatakis and Peterson that he contends created a hostile environment.  (August 2019 EEOC Charge 5.)  However, none of these purported incidents rise to the level of age-based harassment.  As the Fourth Circuit noted in *Sunbelt Rentals*, "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard . . . . Thus, complaints premised on nothing more than 'rude treatment by [coworkers],' *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), 'callous behavior by [one's] superiors,' *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or 'a routine difference of opinion and personality conflict with [one's] supervisor,' *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), are not actionable under Title VII[]" and therefore are not actionable under the ADEA.  *Sunbelt Rentals*, 521 F.3d at 315–16.  The court therefore finds that Kendrick has not shown that he experienced a hostile work environment based on his age.  The Bank's motion for summary judgment as to the hostile work environment claim in Count I will be granted.

**D.  Count II: Retaliation**

Kendrick alleges that his termination was an act of retaliation by the Bank for filing his EEOC claim and subsequent lawsuit.  (Am. Compl. ¶ 94.)  The ADEA prohibits an employer from retaliating against an employee for engaging in protected activity, such as making a charge of age discrimination or opposing a practice made unlawful by the ADEA.  29 U.S.C. § 623(d).  Courts analyze ADEA retaliation claims using the Title VII framework.  *Davis v. Durham Mental Health Dev. Disabilities Substance Abuse Area Auth.*, 320 F. Supp. 2d 378, 408 (M.D.N.C. 2004).  A plaintiff alleging retaliation must demonstrate that: (1) he was engaged in a protected activity, (2) an adverse employment action was taken against him, and (3) there was a causal link between the protected activity and adverse action.  *Laughlin*, 149 F.3d at 258.  After a *prima facie* case for retaliation is made, the burden shifts to the employer to show that it took adverse action for a legitimate non-retaliatory reason.  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015).  If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating the employer's purported non-retaliatory reasons were pretext for discrimination.  *Id*.

It is undisputed that Kendrick suffered an adverse employment action when he was terminated on May 29, 2020, and that Kendrick's filing of his age discrimination lawsuit against the Bank on December 2, 2019, is protected activity.  *See, e.g.*, *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991) (finding that appellant engaged in protected activity by bringing an unlawful employment discrimination lawsuit); *Monk v. Stuart M. Perry, Inc.*, No. 5:07-cv-00020, 2008 WL 2901347, at *2 (W.D. Va. July 18, 2008) ("[T]here is no question that [plaintiff] engaged in protected activity in filing a complaint with the EEOC and a lawsuit in federal

court."). The remaining threshold question, then, is whether Kendrick was also engaged in a protected activity when he provided the confidential documents to his attorney, as he contends.

### 1. Protected activity

An employee is engaged in protected activity if he has "opposed any practice made unlawful by" the ADEA (the opposition clause), or if he has "participated in any manner in an investigation, proceeding, or litigation under" the ADEA (the participation clause). *See* 29 U.S.C. § 623(d); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (applying the Title VII standards on opposition and participation activities to claims under the ADEA). "The statute's participation clause provides absolute protection to a limited range of conduct. It protects 'participat[ion] in any manner in an investigation, proceeding, or hearing under this subchapter.' 42 U.S.C. § 2000e-3(a). Given the clear directive inherent in the phrase 'in any manner,' the clause protects participation activities even when they are plainly 'unreasonable' or irrelevant." *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018) (citing *Glover v. S.C. Law Enf't Div.*, 170 F.3d 411, 414 (4th Cir. 1999)).

Kendrick claims he was engaging in participation activity when he removed the documents without the Bank's authorization and provided them to his attorney. (Hr'g Tr. 49:17–18.) He contends that he was acting as a whistleblower regarding the Bank's discrimination against him and believed he was permitted to furnish these documents to his attorney under the Bank's whistleblower policy, which states,

> Directors, officers, or employees shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law or that is in a complaint or other document as filed under seal in a lawsuit.

(Kendrick Dep. 185:13–15; Carter Bank & Trust Code of Conduct 8, Ex. 74 to Mot. for Summ. J.)  However, this section of the Bank's code of conduct applies specifically to the disclosure of *trade secrets*.  The section that ostensibly applies to workplace discrimination allegations allows the Bank's employees to report violations of federal law "to any government official or agency . . . ."  (Code of Conduct 8.)  This provision notably does not protect employees who remove their employer's confidential documents and share them with their attorneys and certainly does not permit employees to share this confidential information with the general public.  (*Id.*) Furthermore, the code of conduct protects employees from criminal and civil liability, not adverse employment actions.  (*Id.*)  Kendrick nevertheless maintains that he believed he was protected by the whistleblower provision in the Bank's code of conduct when he shared the confidential documents.  His misunderstanding of a trade secret is, however, irrelevant to this analysis.

Courts generally disfavor finding that an employee's dissemination of confidential documents, as well as other violations of their employer's code of conduct, constitute protected activity.  As the Ninth Circuit noted in *O'Day v. McDonnell Douglas Helicopter Co.* in the opposition clause context,

> In balancing an employer's interest in maintaining a "harmonious and efficient" workplace with the protections of the anti-discrimination laws, [courts] are loathe to provide employees an incentive to rifle through confidential files looking for evidence that might come in handy in later litigation.  The opposition clause protects reasonable attempts to contest an employer's discriminatory practices; it is not an insurance policy, a license to flaunt company rules[,] or an invitation to dishonest behavior.

79 F.3d 756, 763–64 (9th Cir. 1996).  *See also Barnard v. Powell Valley Elec. Coop.,* 2022 WL 1261831, at *9 (6th Cir. 2022) (rejecting the plaintiff's contention that she engaged in protected activity when she attempted to steal her employer's records because her acts in seeking this

information, alone, were a violation of company policy); *Laughlin*, 149 F.3d at 260 (finding the employer's "decision to terminate [an employee who removed confidential information] was sound [because the employer] had a reasonable and significant interest in preventing the dissemination of confidential personnel documents"); *but see Kempcke v. Monsanto Co.,* 132 F.3d 442, 445 (8th Cir. 1998) (reversing grant of summary judgment to employer where employee removed documents because removal was participation activity).

Moreover, the Fourth Circuit has taken an unequivocal stance that, whether it be participation or opposition activity, "[i]t is black letter law that illegal actions are not protected activity." *Laughlin*, 149 F.3d at 259. The Bank contends that the publication of the documents violated the Gramm-Leach-Bliley Act (GLBA), 15 U.S.C. § 6802, which provides, in pertinent part, that "a financial institution may not directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." While Kendrick may quibble about whether the customer information was confidential under the Bank's *code of conduct*, it is undisputed that the documents Kendrick, an employee of the Bank, provided to his counsel included "non-public personal information of bank customers" that was subsequently published to the general public, and that Kendrick did not provide notice to these customers or allow them to opt out of the disclosure of their information. (Kendrick Dep. 338:15–339:17, 350:2–7.) Furthermore, the GBLA does not specify that a violation must be made knowingly or voluntarily to incur liability under the statute, so, while Kendrick describes the dissemination of these documents as a "mistake," the publication of the documents nevertheless violated the GBLA. (*Id.* at 205:1.)

25

In an analogous case, *Netter*, the Fourth Circuit found that although the plaintiff believed she was engaging in participation activity when she provided confidential personnel files to her attorney, as well as several government officials and the EEOC, in support of her religious and racial discrimination claims under Title VII, her actions did not constitute protected activity.  908 F.3d at 940.  The court noted that she had violated her employer's policy restricting the review and dissemination of these records and that her employer believed she had failed to conform to the standards of her position.  *Id.* at 936.  The Fourth Circuit placed the most weight, however, on her employer's contention that she had violated state law when she disseminated the personnel files.  *Id.*  North Carolina law expressly forbids the knowing and willful examination, removal, or copying of any portion of a county employee's personnel file without authorized access.  N.C. Gen. Stat. § 153A-98(f).  The Fourth Circuit found, "[W]e cannot conclude that Netter's unauthorized inspection and copying of the personnel files constituted protected participation activity for a straightforward reason.  She violated a valid, generally-applicable state law."  *Netter*, 908 F.3d at 939.  The court did not consider whether the plaintiff was ultimately charged or convicted under the statute, just that her conduct violated the law.  *Id*.  The Fourth Circuit also examined whether the state law conflicted with Title VII or meaningfully impeded a litigant's ability to pursue a Title VII claim and found that it did not.  *Id.* at 940.  The court thus affirmed the district court's grant of summary judgment to the defendant.  *Id.* at 941.  *See also Laughlin*, 149 F.3d at 259 n.3 (finding that the removal of documents could be considered theft and would therefore not constitute protected activity).

The court will follow a similar approach here.  The GBLA is a valid federal statute that does not conflict with the ADEA and in no way impedes a litigant's ability to bring an ADEA claim.  Kendrick's disclosure of the non-public personal information of the Bank's customers

violated the GBLA; therefore, his disclosure of the confidential documents cannot be considered protected activity.  Kendrick contends that, because the FDIC has not taken action against him or his attorney for the publication of the documents, his conduct did not violate the GLBA.  (Resp. in Opp'n 25.)  Yet, as in *Netter*, the operative question is whether Kendrick's *conduct* violated the GBLA, not whether he has been charged or convicted of violating the statute.

Kendrick also argues that he did not "allow" the documents to be shared publicly because his attorney was the one to post them on PACER.  (*Id.* at 16.)  This is merely a matter of semantics; had Kendrick not taken the confidential information, the information would never have been published on PACER.  And Kendrick, in fact, conceded this point in his deposition testimony.  (Kendrick Dep. 342:6–15 (agreeing that the "information wouldn't have been posted online if [Kendrick] didn't take that information from the bank in the first place.").)  Additionally, the dissemination of the confidential material to the public via PACER was not Kendrick's only violation of the GBLA; Kendrick's actions in providing the confidential documents to his attorney, a nonaffiliated third-party, also violated the statute.  Furthermore, Kendrick's attorney was acting as his agent when uploading the documents onto PACER, making Kendrick liable for his attorney's actions taken on his behalf.  *See Comm'r v. Banks,* 543 U.S. 426, 436 (2005) ("The relationship between client and attorney . . . is a quintessential principal-agent relationship."); *Farabee v. Clarke*, 967 F.3d 380, 392 (4th Cir. 2020) (citing *Maples v. Thomas*, 565 U.S. 266, 281 (2012) ("A client is usually bound by counsel's actions since counsel acts as the client's agent.").

Although Kendrick contends that he believed he was engaging in protected participation activity when he provided the documents to his attorney, his disclosure violated the GBLA.  The court therefore finds that Kendrick's disclosure of non-public customer information was not a

protected activity.  Because Kendrick's conduct also violated the Bank's policy, the court would make the same finding regardless of the illegality of his actions under the GBLA.

**2. Causal connection**

Kendrick asserts that his termination was, at least in part, in retaliation for his filing of an EEOC charge and this lawsuit.  (Am. Compl. ¶ 94.)  As stated above, to succeed on an ADEA retaliation claim, a plaintiff must demonstrate a causal link between a protected activity and an adverse employment action.  *Laughlin*, 149 F.3d at 258.  A causal connection can be demonstrated by "show[ing] that 'the adverse act bears sufficient temporal proximity to the protected activity,'" showing "the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity,'" or a combination thereof.  *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (quoting *Roberts*, 998 F.3d at 123).

The temporal proximity between a protected activity and an adverse action must be "short enough to support an inference that the adverse action was *caused by* the protected activity."  *Ferrell v. Army & Air Force Exch. Serv.*, No. 1:23-cv-01199-MJM, 2023 WL 8478890, at *4 (D. Md. Dec. 6, 2023) (citing *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)) (emphasis added).  The Fourth Circuit has held that a "lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (internal citations omitted).  A temporal lapse of even two months may be too long to support an inference of causation without other retaliatory acts in the interim.  *See, e.g.*, *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (finding that a lapse of two months is "sufficiently long so as

to weaken significantly the inference of causation") (internal citations omitted); *Roberts,* 998

F.3d at 127 (finding that plaintiff's termination three months after his last report of harassment

does not create "a strong inference of retaliation").

Here, Kendrick filed his age discrimination lawsuit on December 2, 2019, and was

terminated on May 29, 2020, which was nearly six months later, sufficiently long enough to

weaken any inference of retaliation.  Kendrick, therefore, has not established close temporal

proximity between the filing of his EEOC complaint and his termination.

Since Kendrick is unable to establish temporal proximity, he must point to the existence

of facts that demonstrate that his termination occurred *because of* the filing of the lawsuit.

Kendrick does not meet this burden.  Kendrick merely states that he was terminated "because I

filed the lawsuit with the [B]ank . . . . I think the [B]ank used me filing the lawsuit and they

thought by me giving my attorney documents . . . , that was the opportunity to get rid of an old

man with Carter Bank due to age."  (Kendrick Dep. 359:18–360:1.)  Beyond these conclusory

statements, Kendrick fails to present any evidence that his termination was motivated by

retaliatory animus.  Again, Kendrick admits that allowing the publication of the Bank's

confidential information was a "terminable offense."  (*Id.* at 78:14–19.)  Furthermore, as

discussed above, the Bank has provided a legitimate, non-discriminatory reason for Kendrick's

termination that bears no relation to the filing of his lawsuit.  The court therefore finds that

Kendrick has failed to establish a *prima facie* case of retaliation against the Bank.  The Bank's

motion for summary judgment as to Count II will be granted.

### E.  Other pending motions

#### 1.  Motion to Exclude the Expert Opinions of David Hart (Dkt. No. 167)

One of the documents Kendrick submitted in support of his summary judgment motion is an affidavit from his expert witness, David Hart.  (Hart Expert Report, Dkt. No. 168-1.)  The Bank seeks to exclude Hart's testimony under Rule 702 of the Federal Rules of Evidence.  (Br. in Supp. of Mot. to Exclude, Dkt. No. 168.)  Hart's affidavit primarily focuses on Hart's assessment of Kendrick's satisfactory performance as the head of the IT department *before 2018*.  (Hart Expert Report 1.)  As noted above, the court finds that Kendrick's dissemination of confidential documents unquestionably means that he was not performing satisfactorily *at the time of his termination*.  Even if the court *were* to credit Hart's assessment of Kendrick's work performance prior to 2018, the court would nevertheless find that the Bank is entitled to summary judgment. The court will therefore dismiss the Bank's motion to exclude as moot.  *See Am. Safety Ins. Co. v. Page's Thieves Mkt., Inc.,* No. 2:15-cv-3266-PMD, 2016 WL 4430839, at *2 (D.S.C. Aug. 22, 2016) ("In the Court's view, American Safety is entitled to summary judgment even without its expert's affidavit, and the defense expert's report does not create a genuine issue of material fact. Accordingly, the Court need not rule on either motion."); *Stoddard v. Subaru of Am., Inc.*, No. CV DLB-20-2164, 2023 WL 6381505, at *10 (D. Md. Sept. 28, 2023) ("The Subaru defendants challenge the admissibility of Yannaccone's testimony under Rule 702 of the Federal Rules of Evidence.  The Court need not address their arguments because it finds Stoddard's claims do not survive summary judgment even with the support of Yannaccone's report and opinions."); *Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co.*, No. 5:12-CV-636-BO, 2014 WL 2157442, at *5 (E.D.N.C. May 23, 2014) ("As the Court has granted summary judgment in

favor of Westchester on Clancy's tortious breach of contract claim, Clancy's motion to exclude Westchester's expert on this issue is denied as moot.").

### 2. Motion to Strike David Hart's Declaration (Dkt. No. 183)

On November 23, 2022, after the Bank had moved to exclude Hart's expert opinions, Kendrick filed a memorandum in opposition to the motion to exclude that included a supplemental expert report from Hart, again discussing Kendrick's work performance.  (Hart Decl., Dkt. No. 179-1.)  The Bank claims that the supplemental declaration was untimely, included opinions that exceeded the scope of Hart's initial report, and was otherwise not justified.  (Br. in Supp. of Mot. to Strike Decl. 4–8, Dkt. No. 184.)  Kendrick contends that the declaration *was* timely and should not have come as a surprise to the Bank.  (Resp. in Opp'n of Mot. to Strike Decl. 1, Dkt No. 189.)  Just like the Bank's motion to exclude discussed above, this motion to strike is ultimately moot.  The supplemental declaration again favorably evaluates Kendrick's work performance prior to 2018, which the court has deemed irrelevant to its summary judgment analysis.  The court will therefore dismiss the Bank's motion to strike Hart's declaration as moot.  *See Mt. Valley Pipeline, LLC v. 1.89 Acres of Land*, Civil Action No. 7:19-cv-00078, 2019 WL 6467833, at *3 (W.D. Va. Dec. 2, 2019) (dismissing motion to strike as moot because there was no genuine issue of material fact regarding content of witness's testimony); *Barnhill v. A&M Homebuyers, Inc.*, No. PWG 19-2299, 2022 WL 3586448, at *7 (D. Md. Aug. 22, 2022) ("Both parties have moved to strike expert opinion testimony.  Because . . . Defendants' motion for summary judgment will be granted on all Plaintiffs' claims, the discussion of expert testimony related to damages is moot and shall be denied as such.")

### 3.  Motion to Strike Kendrick's Notice of Supplemental Facts (Dkt. No. 221)

As noted above, Kendrick filed untimely notices of supplemental facts long after the

briefing for the motion for summary judgment had concluded and without leave of the court.

Briefing on the Bank's motion for summary judgment concluded on November 28, 2022, when

the Bank filed its reply to Kendrick's response to the motion for summary judgment.  (*See* Dkt.

No. 181.)  Local Rule 11(c)(1) states that no further briefing may be submitted without first

obtaining leave of court, which Kendrick did not obtain.  *See Duarte v. Truist Bank,* No. 3:20-cv-

00270-FDW-DSC, 2021 WL 4810337, at *3 (W.D.N.C. Oct. 14, 2021) (granting motion to strike

plaintiff's supplemental memorandum because plaintiff did not request leave from court under

analogous local rule).  The court will therefore grant the Bank's motion to strike Kendrick's first

notice of supplemental facts.  Additionally, and as discussed above, the court does not consider

Kendrick's other supplemental notices to be part of the summary judgment record.  Even it did,

the ruling would not change.

### III.  CONCLUSION

For the foregoing reasons, the court will grant the Bank's motion for summary judgment,

dismiss as moot the Bank's motion to exclude and its motion to strike Hart's declaration, and

grant the Bank's motion to strike Kendrick's first notice of supplemental facts.  An

accompanying order will be entered.

Entered: March 29, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge